**Rosemarie ZAINO**

v.

**Frank N. ZAINO.**

**No. 2000–74–Appeal.**

Supreme Court of Rhode Island.

March 3, 2003.

Colleen Crudele, Steven N. Ortoleva, for Plaintiff.

Lauren E. Jones, Providence, Jeremy W. Howe, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Court for oral argument on December 2, 2002, on appeal by the defendant, Frank N. Zaino (Frank or defendant) from a Family Court judgment in favor of the plaintiff, Rosemarie Zaino (Rosemarie or plaintiff).

On August 11, 1989, after thirty-three years of marriage, Rosemarie initiated divorce proceedings against her husband, alleging irreconcilable differences which led to the irremediable breakdown of the marriage; Frank subsequently filed a counterclaim seeking the dissolution of the marriage on the same grounds. Based upon the income and assets disclosed to each other at that time, the parties executed a marital settlement agreement on November 15, 1990; this agreement later was approved and incorporated by reference, but not merged, into the interlocutory decree and final judgment of divorce. The agreement provided for an equitable distribution of the marital assets, providing Rosemarie with title to the marital domicile, her automobile, two burial vaults, and her personal property. Frank was provided with the remaining real estate, his engineering business, boat, automobiles and personal property. The parties each took a one-half interest in the proceeds from the sale of land, a time-share property in the Caribbean, and the approximately "$30,000–$32,000" contained in a joint bank account at Citizens Bank. In addition, in lieu of alimony or "support," and apparently in order for Rosemarie to gain tax benefits by its classification, Frank agreed to pay Rosemarie a "marital settlement agreement payment" of $208,000, $1,000 per week for the next four years. He agreed to pay $25,000 in legal fees incurred by Rosemarie, and $5,500 for the certified public accountant Rosemarie employed to examine Frank's assets and income over the course of the discovery process. Most notably, both parties signed a provision in the settlement agreement representing that "each has made a full disclosure * * * of all assets owned by him or her[.]" Overall, the distribution of assets was set by agreement at 80 percent for Rosemarie and the remaining 20 percent for Frank. This settlement agreement was approved by the Family Court General Magistrate. Thereafter, Frank complied with the distribution provisions in the agreement and paid Rosemarie and her creditors accordingly. However, at the time when the agreement was signed, and for years thereafter, Frank was not forthcoming about the true value of his assets and income. He was gravely noncompliant with the terms of the disclosure provision that he had carefully read and signed before executing the settlement agreement. It was Rosemarie's later discovery of this blatant dishonesty that has led us to the present appeal.

The divorce from Rosemarie would not be Frank's final interaction with the courts in this state. Years after the final divorce decree, Frank was among a group of individuals under investigation for the crimes of bribery and extortion during the administration of Governor Edward D. DiPrete.[1]

1. *See State v. DiPrete*, 710 A.2d 1266 (R.I. 1998). In the course of cooperating with the Attorney General's office, Frank admitted to his participation in a kickback scheme in which he would pay the DiPrete campaign in exchange for government contracts. Frank also admitted to a "travel bump" scheme that he used to gain access to undetected money.

Frank cooperated with the state and agreed to truthfully disclose any illegal activity known to him in exchange for immunity from criminal prosecution. During the course of this investigation, it became apparent that as part of his allegedly illegal dealings Frank had failed to disclose to Rosemarie and the Internal Revenue Service the full extent of his income and assets during his marriage. Subsequent investigation revealed the true value of the resources under Frank's control during the marriage, an amount far in excess of Frank's previous disclosures. In 1995, pursuant to the immunity agreement, and in an apparent attempt to make him a more palatable state's witness, Frank was required by the Attorney General to file an amended income tax return and declare his unreported earnings for the years 1988, 1989, and 1990, a period in which he was still married to Rosemarie. In 1997, upon reading a newspaper article detailing Frank's role in the DiPrete scandal, Rosemarie became aware of Frank's fraudulent conduct.

Rosemarie returned to Family Court and filed a complaint for post-judgment relief, seeking an ex-parte restraining order to freeze Frank's assets, a constructive trust of the assets of Frank's current wife and sister in which Rosemarie had an equitable interest, and a finding of contempt against Frank. The Family Court entertained her complaint and the General Magistrate reopened the divorce judgment and settlement agreement based upon Rosemarie's allegations of fraud.

The hearings in this matter spanned more than eighteen months, from April 30, 1997, to December 16, 1998. Among the many impediments to its speedy resolution was Frank's noncompliance with his discovery obligations. At the onset of discovery, Rosemarie requested a myriad of financial records pertaining to Frank's business transactions. Frank failed to comply with even the most rudimentary request; he repeatedly was evasive in his answers to interrogatories and failed to produce requested documents, alleging that his business records were in the custody of the Attorney General and beyond his reach, having been produced in compliance with a statewide grand jury subpoena for the DiPrete investigation. Rosemarie filed motions to compel more responsive answers, for production of documents, and for sanctions. On December 22, 1997, after two hearings during which Frank testified, the trial justice ordered an immediate sanction of $250 per day, to commence the following day, until Frank fully complied with discovery. This monetary sanction served to galvanize Frank into action. The next day, December 23, 1997, Frank appeared at the Attorney General's office and copied thousands of documents relating to the discovery orders. Eight days later, Frank served upon Rosemarie's counsel supplemental answers to the original interrogatories. In January 1998, Frank filed a motion to terminate the sanctions. However, the trial justice denied his request, noting that Frank had failed to produce several relevant statements and cancelled checks from his engineering business, F.N. Zaino & Associates (Zaino Associates). The trial justice directed that the records custodian at the Attorney General's office be contacted to verify whether Frank had access to the records that he had thus far failed to produce.

On February 16, 1998, Christopher Cotta, an investigative auditor for the Attor-

As part of the scheme, Frank would file false travel expense reports for various employees, pay said employees in "reimbursement" checks, ask them to cash the check, and then ask them to relinquish the funds back to him.

ney General, executed an affidavit affirming that several documents pertaining to Zaino Associates had been stored in a separate evidence locker while the state was seeking appellate review in the DiPrete case. The affiant declared that these documents had not been made available to Frank on a timely basis. However, it is unclear from the record whether the trial justice was apprised of this information. Ultimately, Frank faced sanctions totaling $64,750 running from December 23, 1997 until December 16, 1998.[2]

After three days of hearings on the merits, devoted primarily to Frank's own testimony, the trial justice issued a decision and commented upon Frank's "lack of sincerity and blatant deceit" and found his testimony to be evasive. He declared that Frank was not a credible witness and found that throughout the course of the proceedings Frank had engaged in fraudulent and deceitful conduct. Frank was deemed to be in willful contempt and, based upon the numerous inconsistencies in Frank's testimony, his reluctant admissions, and the damning documentary evidence, the trial justice found that Frank had attempted to defraud his former wife and the Family Court.[3]

After making deductions for state and federal income taxes, the trial justice calculated the amount of Frank's undisclosed earnings, income, and hidden assets, and ordered him to pay Rosemarie $525,483, based upon his earlier agreement to distribute 80 percent of the marital estate to Rosemarie. Additionally, based on the

"total lack of cooperation and defiance with [Family Court] orders," and for having caused this proceeding to take two years, "rather than accepting the responsibility in the first instance," Frank was ordered to pay $64,750 in discovery sanctions and $61,900 for Rosemarie's legal fees. Finally, Frank was ordered to pay accounting fees for the court-appointed receiver ordered to oversee Frank's business to protect Rosemarie's interests during this proceeding. Frank filed a motion to reopen the case, and upon its denial, Frank perfected this appeal.

On appeal, Frank asserts that the trial justice erroneously reopened the fully executed divorce settlement agreement and judgment and did so based upon insufficient evidence. The defendant argues that because the fraud alleged in the case was intrinsic in nature, it should not be grounds to revisit the final judgment or property settlement agreement. He urges this Court to characterize Frank's perfidy as a failure to disclose discoverable facts that ought to have been challenged during the divorce proceeding, but was voluntarily waived by Rosemarie when she agreed to the property settlement agreement. In the alternative, Frank argues that even if the case was correctly reopened, the trial justice erred by improperly including his undisclosed income in the calculation of marital assets and by awarding Rosemarie duplicative recovery of certain funds that he alleges had been previously distributed. Additionally, Frank challenges the award of attorney fees. Finally, Frank claims

---

2. Pursuant to the trial justice's ruling, weekends and holidays were excluded from the 259–day total in which sanctions were imposed.

3. The trial justice found that approximately $208,000 had been hidden through various bank accounts and through fraudulent schemes at Frank's workplace; 80 percent

due Rosemarie was calculated at $166,400. In addition, Frank had misrepresented $748,090 in income; after calculating a 40 percent credit for state and federal taxes, the money due Rosemarie was $359,083. In total, $525,483 was awarded to Rosemarie for undisclosed assets and income, over and above the original settlement amount.

that the trial justice abused his discretion by imposing discovery sanctions before the issuance of an order to compel production, or alternatively, in failing to vacate the sanctions after he had complied with Rosemarie's requests.

Rosemarie applauds the trial justice's decision as proper and well supported by the evidence; she points to Frank's damning admissions and total lack of credibility. She maintains that the Family Court had jurisdiction over this post-judgment divorce proceeding because fraud was at the heart of her claims and clearly was established by the evidence. She affirms the 80 percent distribution in her favor as consistent with the parties' original agreement and a proper remedy because of Frank's willful and fraudulent behavior that served to vitiate her assent to the original settlement agreement. Not surprisingly, Rosemarie supports the monetary calculations as accurate, the award of attorney's fees as equitable, and the sanctions as appropriate.

### Fraudulent Misrepresentation of Assets

■ Based upon our review of the evidence in this case, including Frank's appalling behavior, we are satisfied that the final divorce judgment and settlement agreement were properly before the Family Court. The evidence disclosed that defendant intentionally had failed to disclose various assets and misrepresented his income in negotiating the marital settlement agreement. The trial justice proceeded to award plaintiff 80 percent of the amount that subsequently was ascertained. A misrepresentation of the terms, quality or other aspects of a contractual agreement that "leads another to enter into a transaction with a false impression of the risks, duties, or obligations involved" is fraud in the inducement. Black's Law Dictionary 671 (7th ed.1999). One who has been induced to enter into a contract based upon a

fraudulent misrepresentation is not bound by its terms, *Bjartmarz v. Pinnacle Real Estate Tax Service*, 771 A.2d 124, 127 (R.I. 2001), and may seek rescission of the agreement or affirmance of the contract and a suit for damages. *Halpert v. Rosenthal*, 107 R.I. 406, 412–13, 267 A.2d 730, 733–34 (1970). "It follows logically from this rule that, when one induces another by means of a material misrepresentation to forgo a benefit to which he [or she] is legally entitled under a contract, the latter may recover that which he [or she] has forgone." *Dudzik v. Leesona Corp.*, 473 A.2d 762, 767 (R.I.1984).

■ Despite the original case caption and number, this claim for damages, arising from fraudulent misrepresentations of defendant's assets and income, was independent of the original divorce proceeding. The trial court retained the inherent power to adjudicate Rosemarie's claim of fraud, notwithstanding the passage of six years. Although Rule 60(b)(3) of the Family Court Rules of Procedure for Domestic Relations provides relief from a judgment upon "fraud * * *, misrepresentation, or other misconduct of an adverse party," by motion, not more than one year after entry of judgment, this "rule does not limit the power of a court to entertain an independent action * * *, or to set aside a judgment for fraud upon the court." Rule 60(b). Additionally, independent actions "are separate and distinct avenues of relief * * * not governed by the time limit imposed upon 60(b) motions." *Paul v. Fortier*, 117 R.I. 284, 289, 366 A.2d 550, 553 (1976). The claim for relief instituted by Rosemarie was not a Rule 60(b) motion, but was an independent action to reopen the judgment and was not inconsistent with the Rules of Procedure for Domestic Relations. Clearly, there was demonstrated evidence of fraud committed during the

settlement process sufficient to warrant the court to entertain this claim.

In *Giha v. Giha,* 609 A.2d 945 (R.I.1992), the wife, upon discovering that her ex-husband had failed to disclose a winning lottery ticket while the parties were still married, sought post-final-decree relief from a divorce judgment more than one year after its entry. The trial court dismissed the action, holding that the interlocutory order relating to a division of assets "severs 'the economic ties between the parties,' " *id.* at 947, and that once the property rights of the parties were adjudicated, "public policy requires that there must be an end to litigation" rather than subject our judicial system "to chaos by a continual uncertainty of judgments." *Id.* at 949. Rejecting the notion that lingering uncertainty would result if an independent action were allowed to alter a final judgment, this Court confirmed the authority of the Family Court to entertain an independent action to set aside the judgment and remanded the case for a determination of what portion of the lottery prize, if any, should be equitably distributed between the parties. *Id.*

▮▮▮ This Court has had occasion to address the significance of a non-merged property settlement agreement in the context of a motion to modify its provisions. On those occasions we have adhered "to hundreds of years of contract theory" and declared that property settlement agreements that are incorporated by reference, but not merged into the final divorce decree, retain the characteristics of a contract. *Riffenburg v. Riffenburg,* 585 A.2d 627, 630 (R.I.1991). Implicit in this holding is the caveat that the agreement must be fair and equitable and not the product of fraud or coercion. *See Borden v. Borden,* 649 A.2d 1028, 1030 (R.I.1994) (a property settlement agreement that was reasonable and fair, rather that the product of fraud or coercion remains an independent, binding contract). If it is later determined that the agreement was reached through fraud and trickery, as in any other contract claim, a party may sue for damages in an action for deceit or may rescind the contract and recover what he has paid under it. *Halpert,* 107 R.I. at 412, 267 A.2d at 733. In those circumstances, this Court has recognized that the Family Court has jurisdiction, both legal and equitable, over a non-merged property settlement contract, including a suit for specific performance or wage garnishment. *Bowen v. Bowen,* 675 A.2d 412 (R.I.1996) (per curiam). Specifically, G.L.1956 § 8–10–3 sets forth the jurisdiction of the Family Court and includes the power to hear and decide matters pertaining to "property settlement agreements and all other contracts" between persons who were married at the time of execution of the agreement. We are satisfied that this jurisdictional grant includes the authority to adjudicate claims of fraud in the inducement and to order such relief as is equitable under the circumstances. Furthermore, in *In re Lisa Diane G.,* 537 A.2d 131 (R.I.1988), we declared that the Family Court was vested with inherent authority to hear and determine a complaint seeking nullification of an adoption decree based on allegations of fraud by the Department for Children and their Families [4] and that the Family Court's power was not restricted to actions set forth in Rule 60(b). Reasoning that the Family Court had exclusive jurisdiction over adoptions, we concluded that it was vested with the inherent authority to determine a claim of fraud committed during the adoption process. *In re Lisa Diane G.,* 537 A.2d at 133. Accordingly, we

---

4. In accordance with G.L. 1956 chapter 72 of title 42, the department is presently named the Department of Children, Youth, and Families.

reject defendant's argument that the Family Court hearing justice lacked authority to reopen the final judgment of divorce and the property settlement agreement based upon Rosemarie's allegations of fraud.

■■ The trial justice, vested with the authority to entertain Rosemarie's complaint, heard evidence and found that Frank had committed a fraud upon the court and his ex-wife. This finding was based upon a credibility assessment of Frank's testimony, which was riddled with inconsistencies, and, significantly, upon his own admission that he failed to disclose income and assets.[5] In his June 1999 decision, the trial justice declared,

> "[Frank's] failure to cooperate in Family Court made for very arduous sessions. The defendant suggested oversights when discrepancies were called to his attention. On other occasions he passed the blame to accountants or other [t]hird [p]arties never accepting any of the responsibilities himself. The [d]efendant was not a credible witness to say the least."

The trial justice further found that defendant not only committed fraud in the original divorce proceedings, but also that during his testimony in the present case he continually attempted to defraud his ex-wife and the court. The defendant was described as weaving "a web of deceit" and confusion, and sparring with the court. We will not disturb a trial justice's findings of fact and credibility determinations unless he or she overlooked or misconceived material evidence or was otherwise clearly

wrong. *Giha*, 609 A.2d at 949. Discerning no such deficiency in the decision before us, the finding of fraud will not be disturbed.

### Issues not Preserved for Appellate Review

■ The defendant next contends that Rosemarie failed to adequately plead or prove the element of reliance in her claim of fraud. To establish a *prima facie* case of common law fraud in Rhode Island "the plaintiff must prove that the defendant 'made a false representation intending thereby to induce plaintiff to rely thereon,' and that the plaintiff justifiably relied thereon to his or her damage." *Women's Development Corp. v. City of Central Falls*, 764 A.2d 151, 160 (R.I.2001) (quoting *Travers v. Spidell*, 682 A.2d 471, 472–73 (R.I.1996)). However, the issue of the adequacy of proof on the element of reliance was not raised before the trial justice and, in accordance with our well-established rule, "this court will consider only those matters that have been properly raised in the court below." *Veach v. Veach*, 463 A.2d 508, 509 (R.I.1983). Notwithstanding Frank's failure to properly preserve this issue for appellate review, the very act of entering into a settlement agreement with Frank, her reliance on the disclosure clause signed by him, and the later proof of his actual income and marital assets, clearly suffices as ample reliance by Rosemarie to establish Frank's fraudulent conduct. Accordingly, this contention is without merit.

Additionally, defendant argues that this Court should follow the law of other juris-

---

5. There was ample evidence that Frank had failed to disclose accounts at Barnett Bank, Shawmut/People's Bank, and Old Stone Bank. Additionally, he misrepresented amounts he received from his associates, and money he retained for himself as part of his nefarious "travel bump" and kickback schemes. The discrepancy between the income Frank claimed in his original DR–6 forms and his amended tax returns was another sound basis for a finding of fraud. The trial justice made careful and deliberate reference to this evidence in his findings.

dictions and draw a distinction between intrinsic and extrinsic fraud in the circumstances presented in this case. The defendant argues that only in instances of extrinsic fraud, such as when a party deceives the court about the whereabouts of a party for the purpose of notice, citing *Friendly Home, Inc. v. Shareholders and Creditors of Royal Homestead Land Co.,* 477 A.2d 934, 938 (R.I.1984), or when a judge has been bribed, is there cause to revisit a final judgment. Frank argues that fraud of the type found by the trial justice was quintessentially intrinsic fraud that was capable of being exposed through in-depth discovery and cross-examination, and therefore is an insufficient ground to reopen a final judgment. Once again, this issue was not preserved for appeal. Regardless, we decline to recognize a distinction between the types of fraud that may be actionable in the courts of this state; the law of contracts as developed in this jurisdiction is the controlling authority for the resolution of this issue.

### Equitable Distribution to Rosemarie

■ Frank next challenges the award of 80 percent of his net income and assets to Rosemarie. We are convinced that the evidence of fraud established in this proceeding was sufficient to support the amended judgment and further, we conclude that the 80 percent apportionment to Rosemarie was appropriate and consistent with the parties' original intent. Had Frank been forthcoming from the beginning, Rosemarie would have been entitled to an 80 percent distribution of the marital assets, including the cash he purloined from the marital domicile and deposited in secret bank accounts. In making this award, the trial justice found that Rosemarie had been damaged by Frank's misconduct, was deprived of property that was rightfully part of the marital estate, and suffered the loss of interest income these

funds would have earned. Further, Rosemarie suffered an additional two years of unnecessary litigation. The trial justice declared that,

> "[T]he mere filing of the motions could have and should have resolved this matter if the [d]efendant had been forthright. Instead, the [d]efendant began a course of fraud and deceit even while being afforded immunity from prosecution. To deprive [p]laintiff of any portion of that to which she is entitled as a result of the unilateral effort of the [d]efendant herein seems incongruous."

Based upon the terms of the original marital settlement agreement providing for an 80 percent allocation to Rosemarie and clear evidence of defendant's wrongful conduct, the award of 80 percent of the undisclosed assets and net income is both fair and equitable. This award was well supported by the evidence and did not result in duplicative recovery as Frank contends. We decline to disturb the distribution of these funds.

Additionally, defendant argues that in determining the amount to be equitably distributed, the trial justice erred in including income in his calculation and not limiting his award to monetary assets. The defendant asks this Court to relieve Frank of the amount awarded from his income and to recognize that gross income is not subject to equitable distribution; he asks us to recognize that an award of income is appropriate only in circumstances of spousal support, which Rosemarie waived by agreement. Additionally, Frank contends that the trial justice erred by not first deducting living expenses and taxes from the amount of net income allocated to Rosemarie. We decline to address the merits of defendant's argument because he failed to preserve these issues at any point in this controversy.

### Award of Attorney's Fees to Rosemarie

■ Similarly, we decline to address the defendant's claim of error in the judgment awarding attorney's fees. On appeal, Frank argues that the trial justice abused his discretion by assessing these fees in the absence of any legal authority. As this argument was not presented before the trial justice, it is deemed waived. Therefore, the award of attorney's fees is affirmed.

### Discovery Sanctions

■ We turn to the remaining issue defendant has raised. On appeal, defendant challenges the imposition of sanctions for discovery violations. The defendant properly preserved this argument in the Family Court. At the hearing on Rosemarie's motion for sanctions held December 22, 1997, in which the $250 per day penalty suddenly was imposed, the trial justice found that Frank was most evasive and that he had "failed to respond in an appropriate fashion * * * [and] has done next to nothing relative to [the] discovery [ ] sought in this matter." From our review of the record, it is apparent that the trial justice had a sound basis for this conclusion. When asked on cross-examination about the whereabouts of documentation pertaining to underreported income, Frank admitted that correspondence prepared by the Attorney General existed but continued to spar with counsel over its production. When asked whether he had produced any of the requested documents, Frank admitted that he had copies at home but denied that Rosemarie had requested their production. Further, it was apparent that Frank had made no effort to obtain documents in the possession of the Attorney General; he admitted that he never asked his attorney about retrieving the documents nor did he ask anyone else, including the prosecutors, to comply with his discovery obligations.

The record in this case amply establishes that Frank intentionally hindered the discovery process by his noncompliance and that the trial justice was justified in ordering sanctions as a means of inducing Frank to cooperate. As noted, it was only when faced with a daily monetary sanction that Frank made any efforts to comply with his obligations and appeared at the Attorney General's office the next day to retrieve copies of the relevant material.

■ Rule 37(b) of the Family Court Rules of Procedure for Domestic Relations "provides the court with a smorgasbord of sanctions for situations in which the court is presented with a party's failure to comply with a discovery order pursuant to Rule 37(a)." *Lembo v. Lembo,* 677 A.2d 414, 419 (R.I.1996) (holding that a Family Court justice did not abuse its discretion by imposing $200 per day sanctions for discovery violations by a party during a divorce). Furthermore, "[w]e reverse a trial justice's decision to impose sanctions for Rule 37 violations only when we find that he or she has abused his or her discretion." *Id.* (quoting *Senn v. Surgidev Corp.,* 641 A.2d 1311, 1318 (R.I.1994)).

In the present case, we discern no abuse of discretion on the part of the trial justice when he directed that sanctions be imposed against Frank on December 22, 1997. The evidence, including Frank's obstreperous testimony, amply establishes that he was not in good faith and failed to make any attempt to comply with the discovery requests served upon him. In light of Frank's totally inadequate response and his evasive testimony during the hearing to compel discovery, we are satisfied that the trial justice justifiably could consider Frank's lack of compliance with his discovery obligations to be so deficient as to rise

to the level of a refusal to respond. In situations such as the one presented herein, when faced with what amounts to a party's refusal to respond to a legitimate request to produce discoverable documents, the trial justice is vested with broad discretion to impose immediate sanctions, notwithstanding that an order compelling production previously had not been issued.

 Based on a pattern of evasiveness demonstrated well before the hearing on sanctions and Frank's equivocal and recalcitrant behavior before the trial justice, we conclude that the imposition of an immediate remedial discovery sanction was appropriate in this case. We deem this situation to be analogous to providing an evasive or incomplete answer or response pursuant to Rule 37(a)(3) of the Superior Court Rules of Civil Procedure wherein "an evasive or incomplete answer or response is to be treated as a failure to answer or respond." In those circumstances, Rule 37(d) permits the court "on motion [to] make such orders in regard to the failure [to answer] as are just," including an order "to pay the reasonable expenses, including attorney's fees, caused by the failure [to answer]." Accordingly, we are of the opinion that, in the context of this case, the discovery sanction imposed by the trial justice was reasonable and appropriate. However, we are not persuaded that the duration of the order imposing sanctions, or the refusal of the trial justice to terminate the order upon defendant's request on January 20, 1998, or on February 16, 1998, the date of the Christopher Cotta affidavit, was warranted. As noted, the Cotta affidavit established that during his initial search of the voluminous files in the possession of the Attorney General, Frank did not have access to the remaining documents Rosemarie sought. The trial justice should have terminated the discovery sanction as

of the date of this affidavit. We are of the opinion that the running of a daily sanction during and following the hearing on the merits was an abuse of discretion. The purpose of the sanction imposed in this case was to impel the production of the documents to which Rosemarie was entitled. It was obviously effective because it served to spur Frank into compliance. It was apparent upon the filing of the Cotta affidavit that the remaining records Rosemarie requested were not accessible by the defense; therefore Frank should have been relieved of the sanction as of that date. We vacate that portion of the judgment imposing a monetary sanction from December 23, 1997, through December 16, 1998, and direct that the discovery sanction be recalculated from December 23, 1997, to February 16, 1998.

## Conclusion

For the reasons stated herein, the defendant's appeal is sustained in part and denied in part. We affirm that part of the judgment awarding damages and attorney's fees to Rosemarie. We vacate the discovery sanction and remand this case for a recalculation of the sanction in accordance with this opinion. The papers in this case may be remanded to the Family Court.

Justice Lederberg participated in all proceedings but deceased prior to the filing of this opinion.